# In the United States Court of Federal Claims

No. 17-122V
(Filed under seal January 10, 2024)
(Reissued January 25, 2024)†

```
* * * * * * * * * * * * * * * * * * * * * * *
                                          *
CHELSEA BOSSENBROEK,                      *
                                          *
                  Petitioner,             *
                                          *
         v.                               *
                                          *
SECRETARY OF HEALTH                       *
AND HUMAN SERVICES,                       *
                                          *
                  Respondent.             *
                                          *
* * * * * * * * * * * * * * * * * * * * * * *
```

    *Leah V. Durant*, with whom was *Michael P. Milmoe*, both of Washington, D.C., for the petitioner.

    *Mallori B. Openchowski*, Trial Counsel, Torts Branch, Civil Division, Department of Justice, with whom were *Joseph H. Hunt*, Assistant Attorney General, *C. Salvatore D'Alessio*, Acting Director, *Catharine E. Reeves*, Deputy Director, and *Gabrielle M. Fielding*, Assistant Director, all of Washington, D.C., for the respondent.

## MEMORANDUM OPINION AND ORDER

WOLSKI, Senior Judge.

    Petitioner Chelsea Bossenbroek has moved for review of a special master's decision awarding her compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10–300aa-15 (Vaccine Act or Act), for a shoulder injury related to vaccine administration (SIRVA). Petitioner argues that

---

† Pursuant to Vaccine Rule 18(b) of the Rules of the United States Court of Federal Claims, the parties were given fourteen calendar days in which to object to the public disclosure of information contained in this opinion prior to its publication. No objection has been filed. Accordingly, the opinion is reissued for publication with some minor typographical or grammatical corrections.

the Special Master erred in determining the size of her pain and suffering award under 42 U.S.C. § 300aa-15(a)(4), principally by considering verdicts in tort suits and damages awarded by another special master in reaching his decision.  *See* Pet'r's Mot. for Review at 1 (Pet'r's Mot.), ECF No. 99; Pet'r's Mem. in Supp. of Mot. for Review at 3–18 (Pet'r's Mem.), ECF No. 100.  She also contends that the Special Master erred by failing to consider evidence of emotional distress, by not addressing the effects of inflation, and by not adequately explaining the basis for his calculation of future pain and suffering compensation.  Pet'r's Mot. at 1–2; Pet'r's Mem. at 2, 18–20.  For the reasons stated below, the Court finds that the Special Master erred only in one minor respect, failing to fully articulate the basis for his award for future pain and suffering.  Accordingly, the motion for review is **DENIED-IN-PART** and **GRANTED-IN-PART** and **REMANDED** to the Special Master for further proceedings consistent with this opinion.

# I.  BACKGROUND

In this matter, the basic facts are not in dispute.  Petitioner was a 28-year-old attorney, wife, and mother of a newborn son at the time she was injured by the administration of a flu vaccine received on October 22, 2015.  Tr. (December 13, 2018) (Sp. Mstr. Tr.), ECF No. 64, at 14–16; Ex. 1 at 1–3, ECF No. 7-1.  After the technician at the local pharmacy failed to inject the full dose into Ms. Bossenbroek's upper left arm, a second shot was administered at the site.  Sp. Mstr. Tr. at 17.  The resulting, immediate soreness in her left shoulder increased to severe pain over the next few days, and she consulted a doctor about the injury on November 3, 2015. *Id.*; Ex. 2 at 41–44, ECF No. 7-2.  She was referred to an orthopedist, who in turn referred her to physical therapy.  Ex. 2 at 23–25, 31–33.  When she began physical therapy, she reported pain levels of "2/10 at best" and "6/10 at worst," difficulties sleeping and holding her son because of shoulder soreness, and pain when working at her computer.  Ex. 2 at 24.  The physical therapist found left shoulder tenderness, and some reduction in strength and range of motion.  *Id.*  On December 15, 2015, at the last of six physical therapy sessions held over three weeks, Ms. Bossenbroek reported pain as "0/10" and that she could hold her son without pain increasing in her left shoulder, although she continued to have weakness in the shoulder.  *Id.* at 3–4.  Petitioner's next medical appointment was with an orthopedic physician's assistant on January 4, 2017, at which she reported pain "4/10 at worst" over the prior week, and was diagnosed as suffering from "[c]hronic left shoulder pain."  Ex. 6 at 1–2, ECF No. 7-6.

Because of the one-year gap in medical records beginning three months after the vaccinations, the Secretary of Health and Human Services (Secretary or respondent) disputed whether petitioner met the severity threshold of having had an injury lasting more than six months.  *See* Resp't's Rule 4(c) Rep., ECF No. 23 at 4–5 (citing 42 U.S.C. § 300aa-11(c)(1)(D)(i)); Resp't's Status Rep., ECF No. 56 at 2– 5.  To address this matter, a hearing was scheduled to obtain factual testimony

regarding Ms. Bossenbroek's injury.  *See* Order (Nov. 2, 2018), ECF No. 50.  At the hearing, Ms. Bossenbroek explained that she ended physical therapy in December 2015, despite continuing pain in her left shoulder, because she was busy with a full-time job, a baby, and a move from Illinois to Michigan, but that she alleviated the pain by doing recommended exercises and yoga.  Sp. Mstr. Tr. at 20–23; *see also* Ex. 7, ECF No. 9-1 at 2; Ex. 8, ECF No. 11-1; Ex. 11, ECF No. 28-1 at 3; Ex. 18, ECF No. 34-4 at 1.  She explained, however, that the exercises to address the shoulder pain were time-consuming and unpleasant.  Sp. Mstr. Tr. at 37.  Petitioner testified that the injury to her shoulder interfered with her daily life in various ways, including preventing her from breastfeeding her two children, making the carrying of luggage and lifting of heavy objects difficult, and hindering her in hobbies such as gardening.  Sp. Mstr. Tr. at 17–18, 24–25, 28–30, 34, 37, 39–40.  Petitioner stated that her inability to breastfeed her children because of the shoulder pain was a great disappointment which made her feel she was not a good mother.  Sp. Mstr. Tr. at 29; Ex. 18 at 1.  That petitioner continued to suffer from shoulder pain after her physical therapy had ended was corroborated by the testimonies of a friend and family members.  *See, e.g.*, Sp. Mstr. Tr. at 124–26, 132–35 (testimony of husband); *id.* at 162–63 (testimony of sister); *id.* at 179–80 (testimony of father); *id.* at 192–94 (testimony of family friend); *see also* Exs. 26–29, ECF Nos. 57-2, 57-3, 57-4 & 61-1 (witness declarations).

Three weeks after the hearing, the Special Master issued his tentative findings that petitioner's shoulder injury lasted more than six months but that the ongoing pain was relatively minor.  Tentative Findings of Fact, ECF No. 62 at 2.  After respondent indicated the settlement process could not proceed without a ruling on entitlement, on April 16, 2019, the Special Master issued his formal ruling, determining that Ms. Bossenbroek was entitled to compensation under the Vaccine Act.  *See* Ruling Finding Facts & Granting Entitlement to Comp., ECF No. 69 at 2–3.  The Secretary has not moved for review of the entitlement ruling, and thus petitioner's entitlement to compensation is no longer disputed.

After unsuccessful attempts to encourage the parties to arbitrate the amount of compensation which petitioner would be awarded, including the proposed use of a baseball arbitration approach, *see* Order (July 5, 2019), ECF No. 76 at 1–2,[1] the Special Master undertook the task of determining the proper amount of compensation, and requested briefing from the parties to aid him in this effort.  *See*

---

[1] This approach, in which each side makes a proposal and the decisionmaker selects one (provided it is reasonable), was supported by petitioner even in the absence of parties' consent, based on the wide discretion afforded Special Masters.  *See* Br. Concerning Use of Baseball Arb., ECF No. 78 at 1–3.  The Secretary maintained that such an approach was contrary to law due to statutory caps on binding arbitration.  *See* Resp't's Resp. to Ct.'s Order Re: Baseball Arb., ECF No. 80 at 2–3 (citing 28 U.S.C. § 654(a)(3)).

Order (Nov. 22, 2019), ECF No. 82 at 1–4.  In addition to evidence and arguments concerning the appropriate discount rate, the Special Master ordered briefing regarding pain and suffering, informing the parties:

> . . . the undersigned is interested in the following information listed in order of importance, starting with the most important:
>
> i.     Any decisions regarding pain and suffering for injuries to a shoulder from outside the context of the Vaccine Program.  See Graves v. Sec'y of Health & Human Servs., 109 Fed. Cl. 579, 595-96 (2013) (looking to awards outside of the Vaccine Program).  Cases in which the amount of pain and suffering is distinguished from amounts for other types of compensation will be more useful in resolving petitioner's case.
>
> ii.    Any reasoned decisions from special masters about the amount of pain and suffering for shoulder injuries.
>
> iii.   Any statistical information based upon proffers and stipulations that explain the amount of pain and suffering for shoulder injuries.

*Id.* at 3; *see also* Order (Dec. 20, 2019), ECF No. 84 at 1–2.

Respondent's brief included an eleven-page appendix which listed fifty-five pain and suffering award verdicts, involving shoulder injuries, rendered in state and federal courts over the prior five years.  *See* App. B to Resp't's Br. on Damages, ECF No. 86-2.  This listing identified the case names, the size of the awards, and thumbnail descriptions of the injuries involved.  *See id.* at 1–11.  The text of the brief did not highlight any verdict, but instead noted that the average award was $33,089.93; that nearly seventy-five percent of the awards were $30,000 or less; and that nearly half were $10,000 or less.  Resp't's Br. on Damages at 6.  Respondent identified two vaccine program cases, *Knauss v. Sec'y of Health & Hum. Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Sp. Mstr. May 23, 2018), and *Dagen v. Sec'y of Health & Hum. Servs.*, No. 18-442V, 2019 WL 7187335 (Fed. Cl. Sp. Mstr. Nov. 6, 2019), as involving "comparative facts" and recommended "a similar award of approximately $60,000.00 for past and future pain and suffering."  Resp't's Br. on Damages at 7.  He based this on a $50,000 award for past pain and suffering, and $300 per year for future pain and suffering.  *Id.* at 1, 6.  The Secretary also explained that his recommended award was consistent with his proffers in similar, conceded SIRVA cases.  *Id.* at 9.  He refused, however, to engage the services of an expert to provide evidence on the appropriate net discount rate, arguing that a two percent rate was consistent with prior caselaw.  *Id.* at 10.

In her brief on damages, petitioner requested an award of $125,000 for past pain and suffering, plus an amount for future pain and suffering of $2,500 per year. Pet'r's Mem. on Damages, ECF No. 89 at 7, 14. Petitioner declined to provide data based on decisions outside of the vaccine program, contending that such information was irrelevant to the amount of damages to which she was entitled. *Id.* at 14–15. She argued that tort-based damages awards would be inapposite because, unlike state tort law, the no-fault vaccine compensation scheme was intended by Congress to make awards with "generosity." *Id.*; *see also* Pet'r's Reply Mem. on Damages, ECF No. 93 at 7–9. Petitioner also contended that prior damage awards in SIRVA cases were not relevant, due to the subjective judgment involved, the decisions primarily being the product of just one special master, and their failure to reflect the generosity in awards intended by Congress. Pet'r's Mem. on Damages at 15–17. She disputed the relevance of awards that were the result of settlements, as these involve discounts for litigation risks and the desire of petitioners to avoid payment delays, and involve sealed records which prevent factual comparisons to the injury she has suffered. *Id.* at 17–18; Pet'r's Reply Mem. on Damages at 10–14. Petitioner also submitted a statement from an economist who found her proposed one percent net discount rate to be reasonable. Pet'r's Mem. on Damages at 18–19; *see* Ex. 32, ECF No. 87-1 at 4–5.

As we shall see, the Special Master for the most part followed the government's recommendations. He began his decision on damages with a short discussion of the treatment of pain and suffering damages under the Vaccine Act. *Bossenbroek v. Sec'y of Health & Hum. Servs.*, 2020 WL 2510454, at *1–2 (Fed. Cl. Sp. Mstr. April 3, 2020). The Special Master described the three-factor test which is typically employed---considering the injured person's ability to understand the injury, the degree of the injury's severity and its anticipated duration. *Id.* at *1 (citing *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Sp. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). He noted that special masters previously interpreted the statute to restrict awards of the full $250,000 cap amount to only the most severe cases imaginable, with all others scaled down in relation, a curious practice which was rejected in *Graves v. Secretary of Health and Human Services*. *Bossenbroek*, 2020 WL 2510454, at *1–2 (citing *Graves*, 109 Fed. Cl. 579, 589–90 (2013)).

The Special Master next described the Special Processing Unit (SPU) established by a past Chief Special Master to deal with the large volume of SIRVA cases, and explained the three routes to resolution---by proffer (when both sides agree on the damages), stipulation (when both sides can reach a compromise), or resolution by a special master. *Id.* at *2–3. He noted that stipulations are rare due to an apparent government policy of refusing to compromise in these types of cases. *Id.* The Special Master then detailed Ms. Bossenbroek's injury and the medical

treatment she received for it, including doctor's appointments occurring after the date of the hearing. *Id*. at *4–7.

Turning to the question of damages for past pain and suffering, the Special Master rejected petitioner's argument that damages awarded in other cases cannot be relevant to the determination of her damages. *Bossenbroek*, 2020 WL 2510454, at *8. He noted that the *Graves* decision, highlighted by Ms. Bossenbroek, considered pain and suffering damages awarded in non-Vaccine Act cases. *Id*. (citing *Graves*, 109 Fed. Cl. at 595–96). He also expressly rejected petitioner's suggestion that the Vaccine Act was intended to produce more generous awards than would result from the tort system, noting the Act's cap on pain and suffering awards and prohibition on punitive damages. *Id*.; *see also* 42 U.S.C. § 300aa-15(a)(4), (d)(1). The Special Master thus decided he would consider the pain and suffering awards from other cases involving shoulder injuries in determining petitioner's compensation. *Bossenbroek*, 2020 WL 2510454, at *8. He reasoned that awards in tort suits are usually rendered by juries that are presumed to find facts thoroughly and accurately, *id*. at *9 (citing *Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985)), and he looked first at decisions from outside of the vaccine program due to petitioner's claim that the amounts awarded within the program were systematically too low, *id*.

The Special Master found the Secretary's survey of tort verdicts "contains useful information" and noted that Vaccine Act awards made through the SPU process tended to be "more generous" than the tort verdicts.[2] *Id*. He then noted that the *Knauss* decision from the SPU involved a" roughly analogous" injury and resulted in an award of $60,000. *Bossenbroek*, 2020 WL 2510454, at *10 (citing *Knauss*, 2018 WL 3432906, at *8). After stating that the referenced cases both within and outside the vaccine program "[c]ollectively . . . provide a framework for evaluating" petitioner's case," *id*. the Special Master focused on Ms. Bossenbroek's circumstances.

The Special Master recounted the history of Ms. Bossenbroek's injury, including the medical treatments she received for it and the impacts it had on her daily life. *Id*. at *10–11. He found "especially valuable" several data points from the first two months after petitioner was vaccinated, which showed that the injury had interfered with her ability to breastfeed and required her to visit a physical therapist, but also that the worst of her pain had resolved within those two months.

---

[2] He calculated the mean award from the tort survey data to be $31,105.89. *Bossenbroek*, 2020 WL 2510454, at *9. Reasoned decisions awarding past pain and suffering damages in the SPU ranged from $60,000 to $160,000, and an award including future pain and suffering exceeded $200,000. *See Nute v. Sec'y of Health & Hum. Servs.*, No. 18-0140V, 2019 WL 6125008, at *9–10 & n.15 (Fed. Cl. Sp. Mstr. Sept. 6, 2019).

*Id*. at *10.  The Special Master noted that by 2016, Ms. Bossenbroek's injury was only limiting her daily activities in minor ways, neither preventing her from working as an attorney nor interfering with her ability to travel both for pleasure and for work.  *Id*.  She did continue to suffer certain limitations, such as requiring assistance with luggage and being unable to lift heavy boxes while moving.  *Id*.  The Special Master reasoned that the fact that Ms. Bossenbroek did not seek any medical attention for her shoulder during 2016 indicated that, though she continued to suffer to some extent, her discomfort was not particularly great.  *Id*.

The Special Master then summarized petitioner's subsequent medical history, including a reported shoulder pain rating of 2 out of 10 in early 2017, and physical therapy primarily addressing pain incident to childbirth.  *Bossenbroek*, 2020 WL 2510454, at *11.  After being discharged from physical therapy in August 2018, petitioner declined the opportunity to continue rehabilitation of her shoulder. *Id*.  In July of 2019, an MRI of her shoulder was unremarkable, and she subsequently declined the pain relief of a steroid injection.  *Id*.  Based on this history, the Special Master determined that $50,000 was an appropriate level of compensation for petitioner's past pain and suffering.  *Id*.

Regarding future pain and suffering, the Special Master concluded that Ms. Bossenbroek was entitled to $300 per year, because her ongoing pain was mild.  *Id*. This was the figure proposed by respondent.[3]  *Id*.  To convert this stream of payments for projected pain and suffering to net present value, *see* 42 U.S.C. § 300aa-15(f)(4)(A), the Special Master was required to make findings with respect both to the proper discount rate and Ms. Bossenbroek's life expectancy.  The discount rate determination was something of a walkover, as petitioner presented expert evidence from an economist supporting a 1% rate, and respondent urged a 2%, rate but presented no evidence.  *Bossenbroek*, 2020 WL 2510454, at *11–12. Accordingly, the Special Master found 1% was the proper rate.  *Id*. at 12.  Similarly, Ms. Bossenbroek cited Social Security Administration data to support her estimate of 52.2 additional years of life, while the Secretary proposed 48 years without evidence.  *Id*. at *11.  But on this point, the Special Master merely characterized the disagreement as a "slight difference" and did not expressly select either estimate, announcing instead the conclusion that the sum of $11,692.19 for future pain and

---

[3]  The Special Master reported, incorrectly, that petitioner sought $1,200 per year. *Bossenbroek*, 2020 WL 2510454, at *11.  She in actuality requested $2,500 per year. *See* Pet'r's Mem. on Damages at 7.  As the Special Master simply concluded that the respondent's position was correct and did not make a finding splitting-the-difference between the two positions, this error was non-prejudicial.

suffering was reasonable.[4]  The compensation awarded for all elements totaled $62,901.49.

Petitioner filed a motion for review, challenging the amount of compensation the Special Master awarded to her.  *See* Pet'r's Mot. at 1–2.  Petitioner raises five objections to the Special Master's decision.  *Id.*  First, she claims that the Special Master erred by relying on decisions in non-Vaccine Act cases to support his decision.  *Id.* at 1; *see* Pet'r's Mem.at 3–14.  Second, petitioner asserts the Special Master erred in trying to craft an objective standard to value pain and suffering instead of relying on his own subjective judgment.   Pet'r's Mot. at 1; Pet'r's Mem. at 14–18.  Third, petitioner contends that the Special Master erred by failing to credit her evidence of emotional distress in fashioning an award.  Pet'r's Mot. at 1; Pet'r's Mem. at 19–20.  Fourth, Ms. Bossebroek maintains that the Special Master erred by not addressing the impact of inflation on pain and suffering awards.  Pet'r's Mot. at 1; Pet'r's Mem. at 18–19.  And finally, petitioner argues that the Special Master failed to adequately explain or justify his calculation of future pain and suffering.  Pet'r's Mot. at 2; Pet'r's Mem. at 20.  In defense of the Special Master's decision, respondent maintains that the Special Master did not abuse his discretion when he relied, in part, on other awards both inside and outside the program.  Resp't's Mem. Resp. to Pet'r's Mot. at 7–16 (Resp't's Mem.), ECF No. 103.  Regarding the emotional distress issue, respondent contends that the Special Master properly focused his analysis on the objective medical evidence and evidence concerning the limitations petitioner's injury imposed on her activities and did not disregard any evidence concerning Ms. Bossenbroek's suffering.  *Id.* at 16–18.

## II.  DISCUSSION

### A.  Legal Standards

Under the Vaccine Act, the compensation awarded to a petitioner found to have suffered a compensable injury shall include an amount for "actual and projected pain and suffering and emotional distress from the vaccine-related injury," up to $250,000.  42 U.S.C. § 300aa-15(a)(4).  The Vaccine Act empowers this court, in reviewing a special master's decision, to "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law."  42 U.S.C. § 300aa-12(e)(2)(B).  Findings of fact are to be reviewed under the "arbitrary and capricious" standard; legal questions are to be reviewed under the "not in accordance with law" standard; and an abuse of discretion standard is used for discretionary rulings.  *See Munn v. Sec'y of Dep't of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

---

[4]  The Special Master also awarded $1,209.30 for out-of-pocket costs including, over respondent's objection, $474.62 for baby formula.  *Bossenbroek*, 2020 WL 2510454, at *12.  This aspect of the award is unchallenged on review.

Under the arbitrary and capricious review standard, "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines ex rel. Sevier v. Sec'y of Dep't of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). "An abuse of discretion occurs if the decision is clearly unreasonable, arbitrary, or fanciful; is based on an erroneous conclusion of law; rests on clearly erroneous fact findings; or involves a record that contains no evidence on which the [special master] could base [his] decision." *Cottingham ex rel. K.C. v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1345 (Fed. Cir. 2020) (citation omitted).

## B.  Analysis

Before analyzing the specific objections raised by Ms. Bossenbroek, a few words first about the appropriate standards of review. Petitioner's main arguments are that the Vaccine Act precludes a special master from considering state court verdicts or the awards of another special master, and as these are questions of statutory interpretation, she generally invokes *de novo* review. Pet'r's Mem. at 3. This standard applies, however, only to the extent an objection may be determined by statutory interpretation alone. *See Hines*, 940 F.2d at 1527.

The Secretary, on the other hand, suggests that since the amount awarded for pain and suffering is being challenged, this involves a discretionary decision reviewable for abuse of discretion. Resp't's Mem. at 6–7. The authority he cites to establish the review standard, though, merely employed the standard without explanation or justification. *See Doe*34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009). Respondent, however, also cites cases employing the arbitrary and capricious standard of review. *See* Resp't's Mem. at 7 (citing *Hibbard v. Sec'y of Health & Hum. Servs.*, 698 F.3d 1355, 1363 (Fed. Cir. 2012) (citing *Hines*, 940 F.2d at 1528)).

The Vaccine Act borrows verbatim the first subparagraph of standards listed in the Administrative Procedure Act (APA). *Compare* 42 U.S.C. § 300aa-12(e)(2)(B) ("arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law") *with* 5 U.S.C. § 706(2)(A) (same). In explaining when the abuse of discretion standard applies in Vaccine Act cases, the Federal Circuit initially stated it is "ordinarily used where the tribunal under review *had* a finite range of discretion (e.g. to select a penalty, or to award a specific sum of damages, from within a range of permissible alternatives)." *Hines*, 940 F.2d at 1527 (italics in original). The following year, however, the Circuit added that the standard "will rarely come into play except where the special master excludes evidence." *Munn*, 970 F.2d at 870 n.10. The court also noted that the standards "vary in . . . degree of deference." *Id.* In that opinion, the Federal Circuit also clarified that when our court finds facts in a Vaccine Act case, these determinations are reviewed "under the same standard by

- 9 -

which [the Circuit] review[s] trial court fact findings in other contexts," namely the "clearly erroneous" standard. *Id.* at 871–72. This is because the "special statutory deference" of the arbitrary and capricious standard is given to special masters due to their expertise but does not extend to our court. *Id.* at 871.

Concerning whether the "abuse of discretion" standard applies to determinations of awards for pain and suffering, the undersigned does not believe that the subjectivity of these determinations makes them discretionary. Indeed, the Vaccine Act mandates these awards, to the extent a petitioner proves them. 42 U.S.C. § 300aa-15(a), (a)(4) ("Compensation awarded . . . shall include . . . [f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250.000."); *see also* 42 U.S.C. § 300aa-13(a)(1) (mandating "[c]ompensation shall be awarded").[5] Accordingly, the approach taken by the Federal Circuit to review damages determinations generally should govern, adjusted for the deference the Vaccine Act affords special masters. The arbitrary and capricious standard should be employed for "findings about the general types of damages to be awarded, . . . their appropriateness, . . . and rates used to calculate them." *Home Savings of Am. v. United States*, 399 F.3d 1341, 1347 (Fed. Cir. 2005). On the other hand, "[t]he abuse of discretion standard applies to decisions about methodology for calculating rates and amounts." *Id.*

At the end of the day, it may matter little which of the two standards is applied. When the two tests are discussed in the context of APA review, the Federal Circuit has acknowledged that they are used "interchangeably." *Japanese Found. for Cancer Research v. Lee*, 773 F.3d 1300, 1304 n.3 (Fed. Cir. 2014). And, as we have seen above, the abuse of discretion standard adopted for Vaccine Act cases is a mashup of different standards, including the "clearly" arbitrary, the *de novo* error of law, the clearly erroneous, and the substantial evidence tests. *See Cottingham*, 971 F.3d at 1345.[6]

---

[5] Although the Federal Circuit has stated "[a]warding compensation for pain and suffering is a discretionary matter and does not follow as of right when an award of compensation for vaccine-related injuries is made," *Patton v. Sec'y of Dep't of Health & Hum. Servs.*, 25 F.3d 1021, 1030 (Fed. Cir. 1994), the context of the statement indicates that what was meant was that such awards are not automatic and ministerial but rather are the result of a "deliberative" process. That opinion later noted, "Congress has specifically provided that pain and suffering associated with a vaccine-related injury should be adequately compensated by means of a monetary award." *Id.* at 1030–31.

[6] The Federal Circuit has recognized "[h]ow much difference, if any, these different articulations of the standard of review would make in actual practice is a matter for academic debate." *Munn*, 970 F.2d at 872. *See also Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors*, 745 F.2d 677, 684 (D.C. Cir. 1984) (noting "the

### *1. Does the Vaccine Act Preclude Consideration of Pain and Suffering Awards from Non-Vaccine Act Cases?*

Petitioner argues that the Vaccine Act prohibits special masters from considering damage awards made in state court proceedings. Pet'r's Mem. at 3–14. She bases this argument on the text of the Act, its legislative history, and a principle of national uniformity enunciated by the Federal Circuit. *See id.*

Petitioner's textual argument begins by noting the Federal Circuit's explanation, in the *Patton* opinion, that because special masters are "creature[s] of statute," they must derive their powers from the Vaccine Act or the Vaccine Rules implemented thereunder. *Id.* at 4 (citing *Patton v. Sec'y of Dep't of Health & Hum. Servs.*, 25 F.3d 1021, 1027 (Fed. Cir. 1994)). In that case, a special master was found to have erred when she relied on "inherent authority" to correct a mistake in an award decision after final judgment had been entered by our court, as neither the Act nor the Vaccine Rules in force at that time gave her a power to grant relief from judgment. *See Patton*, 25 F.3d at 1024–27.[7] The Vaccine Act, however, expressly requires that a special master "shall issue a decision . . . with respect to whether compensation is to be provided . . . and the amount of such compensation," and in the process a special master must reach "findings of fact and conclusions of law." 42 U.S.C. § 300aa-12 (d)(3)(A) & (A)(i). Accordingly, special masters do plainly have the power to make legal and factual findings and to determine the amount of compensation due under the various elements.

Focusing on the particular element of compensation at issue, Ms. Bossenbroek maintains that the requirement to provide "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000," 42 U.S.C. § 300aa-15(a)(4), does not "authoriz[e] the Special Master to look outside the Vaccine Act to determine a pain and suffering award." Pet'r's Mem. at 4–5. She contrasts this with the language governing another element, lost earnings, which provides decisional rules for two different categories of claimants. *Id.* at 5 n.1 (citing 42 U.S.C. § 300aa-15(a)(3)(A)–(B)). People who were eighteen years old or older when injured have their lost earnings "determined in accordance with generally recognized actuarial principles and projections." 42 U.S.C. § 300aa-15(a)(3)(A). Those injured before turning eighteen years of age have damages "determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector" adjusted for taxes and health

---

distinction between the substantial evidence test and the arbitrary or capricious test is 'largely semantic'") (Scalia, J.) (citations omitted).

[7] The rules were subsequently amended to provide this power to special masters. *See* Vaccine Rule 36; *see also Vessels v. Sec'y of Dep't of Health & Hum. Servs.*, 65 Fed. Cl. 563, 567–68 (2005) (upholding the validity of Vaccine Rule 36).

insurance premia. *Id.* § 300aa-15(a)(3)(B). Although noting the second rule as a limit on authority, Mrs. Bossenbroek characterizes the first as a grant of authority to "look to outside sources." Pet'r's Mem. at 5 n.1. But, contrary to petitioner's argument, both provisions demonstrate that when Congress wants to direct a particular approach to the calculation of damages, it knows how to do it. *Cf. Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 384 (2013) ("These statutes confirm that Congress knows how to limit a court's discretion . . . when it so desires."); *Mil.- Veterans Advoc. v. Sec'y of Veterans Affs.*, 7 F.4th 1110, 1144 (Fed. Cir. 2021) ("That Congress did not include an analogous provision . . . suggests that it simply did not intend to do so."). No such limitation was placed on special masters in connection with pain and suffering awards, although these also include projections of future circumstances. *See* 42 U.S.C. § 300aa-15(a)(4).

Petitioner maintains that the purpose of the Vaccine Act, as stated in the legislative history, was to create a more generous alternative to the state tort system, and that this purpose would be undermined if special masters considered the size of state law pain and suffering awards in the course of making such awards under the Act. Pet'r's Mem. at 8–10 (citing *Beck v. Sec'y of Health & Hum. Servs.*, 924 F.2d 1029, 1033 (Fed. Cir. 1991) and *Graves*, 109 Fed. Cl. at 590). The *Graves* decision from our court, to be sure, contains dictum borrowed from a Federal Circuit dissent (representing the views of one-third of that court) that "it is clear from the legislative history that Congress intended the Vaccine Act's compensation program to be more generous than the civil tort system." *Graves*, 109 Fed. Cl. at 595 (quoting *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1350 (Fed. Cir. 2011) (en banc) (Dyk, J., dissenting)). But the Court neither agrees with this dictum nor finds it relevant to interpreting the provision in question.

A committee of one house of Congress stated, in a report concerning the initial version of the Vaccine Act, that the legislation "establish[ed] a Federal 'no-fault' compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R. Rep. No. 99-908, pt. 1, at 3 (1986). It also believed that the no-fault basis of the program made it "an appealing alternative to the tort system." *Id.* at 26. The following year, when Congress sought to amend the Act and effectuate it with a funding mechanism, another report of that committee stated its "intention to create a compensation system that is speedy and *generous enough* to dissuade petitioners from going on to court." H.R. Rep. No. 100-391(1), at 691 (1987) (emphasis added). The conference report, reflecting the final version of the amendment which gave our court jurisdiction under the Act, contains no reference to generosity of any kind. *See* H.R. Conf. Rep. No. 100-495, at 771–73 (1987). From this material, the most one can say is that Congress intended the combined features of the Act, including its no-fault basis, *see* 42 U.S.C. § 300aa-11(c)(1), the provision for attorneys' fees, *id.* § 300aa-15(e)(1), (3), and its simplified procedures, *see id.* § 300aa-12(d)(2), to be attractive to claimants who might otherwise file a tort suit. Generosity may simply

be a description of the policy decision to relieve claimants of the need to pay for attorneys and to prove that a vaccine manufacturer was at fault, as opposed to a reference to the absolute size of damages awards, consisting of some elements which are of fixed or capped amounts.  *See* 42 U.S.C. § 300aa-15(a)(2), (4) ($250,000 flat award for death benefits and cap for pain and suffering); *see also Saunders v. Sec'y of Dep't of Health & Hum. Servs.*, 25 F.3d 1031, 1036 (Fed. Cir. 1994) (noting limitations on recovery may make a Vaccine Act petition less attractive than a tort suit).

In any event, the provision concerning pain and suffering awards does not include any ambiguous language from which one might spin a particular limitation on the special master's methodology or process for calculating these damages.  *See* 42 U.S.C. § 300aa-15(a)(4).  We are not presented with a legislative term of art which is defined in a conference report, the circumstance in which the use of legislative history might be understandable.  *See Balestra v. United States*, 119 Fed. Cl. 109, 114 n.10 (2014), *aff'd* 803 F.3d 1363 (Fed. Cir. 2015).  Instead, we have a clear statutory provision into which petitioner would inject undefined terms such as "generosity" or "generous enough."  *But see Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").  Not only are these terms far from evincing a clear purpose, but the same committee report evoking "generosity" contains language which counsels restraint rather than generosity in making awards for pain, suffering and emotional distress.  *See* H.R. REP. NO. 99-908, pt. 1, at 21 ("The Committee does not intend that all petitions for which compensation is awarded be given the maximum level, but rather that the Master consider the individual pain and suffering of the injured person, *as well as the benefits conferred by other forms of compensation within the legislation*.") (emphasis added).  But with no ambiguity in the text itself, the "inquiry thus begins and ends with what [the statute] does (and does not) say."  *Bartels Tr. for the benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d 1357, 1361 (Fed. Cir. 2010); *see also MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 539–40 (2011).

Generic goals, hopes, or aspirations of Congress for a particular program or law cannot legitimately be employed by a court to add substantive guarantees or restrictions to the actual text enacted.  For instance, if Congress were to raise the capital gains tax rate with the aim of raising revenue, but the result was a reduction in taxes collected, a court could not substitute the lower rate necessary to accomplish the legislators' purpose, tempting though that course may be.[8]
The undersigned agrees with the late Justice Scalia's rejection of the "purposivism" approach to statutory interpretation, which locates the purpose of legislation not in

---

[8]  *See* Shahira E. Knight, U.S. Congress Joint Economic Committee, *The Economic Effects of Capital Gains Taxation* 1, 7 (1997) ("The historical data suggest that the government could collect more revenue if the capital gains rate were reduced.").

its text but in such extrinsic sources as legislative history. *See* Antonin Scalia &
Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 18–20, 56–58
(2012); *see also id.* at 376 ("The use of legislative history to find 'purpose' in a
statute is a legal fiction that provides great potential for manipulation and
distortion."). Other than when correcting obvious typographical errors, a non-
textual purpose "cannot be used to contradict text or to supplement it." *Id.* at 57;
*see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 453 (1987) (Scalia, J., concurring in
the judgment) ("Where the language of these laws is clear, we are not free to replace
it with an unenacted legislative intent.").

   The Federal Circuit has recognized that the "overarching purpose" of the
Vaccine Act was for compensation to be awarded "'quickly, easily, and with
certainty and generosity,'" *Cloer v. Sec'y of Health & Hum. Servs.* (*Cloer II*), 675
F.3d 1358, 1362 (Fed. Cir. 2012) (en banc) (quoting H.R. REP. NO. 99-908, pt. 1, at
3), *aff'd sub nom. Sebelius v. Cloer*, 569 U.S. 369 (2013), in the process of finding its
interpretation of the plain meaning of a provision to be consistent with this purpose.
But a few instances of the Federal Circuit noting that the purpose of the Act
is furthered by interpretations it has otherwise reached, *see, e.g., Koston v. Sec'y of
Dep't of Health & Hum. Servs.*, 974 F.2d 157, 161 (Fed. Cir. 1992); *Beck by Beck*, 924
F.2d at 1032–33, does not create any command that this purpose must be used to
graft restrictions onto the Vaccine Act text.[9]

   Moreover, there are numerous decisions of the Federal Circuit in which this
purpose of "generosity" was not enlisted in interpretations of the Act which made
the program less advantageous to claimants. For instance, it would have been more
generous to interpret the pain and suffering cap as applying to future pain and
suffering damages *after* discounting these to net present value, rather than before.
*But see Youngblood v. Sec'y of Dep't of Health & Hum. Servs.*, 32 F.3d 552, 554–55
(Fed. Cir. 1994); *see also McAllister v. Sec'y of Health & Hum. Servs.*, 70 F.3d 1240,
1242 (Fed. Cir. 1995). It would have been more generous to allow the estates of
minors who have died from vaccine-related injuries to receive awards for lost future
wages in addition to the death benefit and the pain and suffering award. *But see
Tembenis v. Sec'y of Health & Hum. Servs.*, 733 F.3d 1190, 1194–96 (Fed. Cir. 2013).
Instead of generously finding that a second petition could be filed when a claimant
who had already received compensation for a vaccine injury subsequently died from
the injury, the Federal Circuit rejected this notion, recognizing that the Act
"contains several limitations and trade-offs that restrict recovery" and concluding
"that these limitations prevent certain individuals who have undoubtedly suffered

_____

[9] The Court notes that a preoccupation with this purpose of "generosity" had, on
one occasion, contributed to an erroneous judgment requiring correction by the
Supreme Court. *See Whitecotton by Whitecotton v. Sec'y of Dep't of Health & Hum.
Servs.*, 17 F.3d 374, 378 (Fed. Cir. 1994), *rev'd sub nom. Shalala v. Whitecotton*, 514
U.S. 268 (1995).

as a result of a vaccine from receiving full (or any) compensation is beyond question." *Zatuchni v. Sec'y of Health & Hum. Servs.*, 516 F.3d 1312, 1322 (Fed. Cir. 2008).

Indeed, in the first *Cloer* en banc decision, the Federal Circuit construed the Vaccine Act as not containing an implicit discovery rule which would have been more generous to claimants, opting to follow "Congress's express desire that the Vaccine Act be 'simple and easy to administer' as well as 'expeditious and fair.'" *Cloer v. Sec'y of Health & Hum. Servs.* (*Cloer I*), 654 F.3d 1322, 1340 (Fed. Cir. 2011) (en banc) (quoting H.R. REP. NO. 99-908, pt. 1, at 7, 12). In so doing, the Circuit rejected the dissent's argument that was based, in part, on the remedial nature and generous purpose of the Act. *See Cloer I*, 654 F.3d at 1350 (Dyk, J., dissenting). And, as the Special Master noted, *see Bossenbroek*, 2020 WL 2510454, at *1, the Federal Circuit in *Griglock* emphasized that "the Vaccine Act provides a generous compensation program, but with limits . . . to that generosity." *Griglock v. Sec'y of Health & Hum. Servs.*, 687 F.3d 1371, 1376 (Fed. Cir. 2012). In that opinion, issued four months after *Cloer II*, the Circuit determined as a textual matter that the longer statute of limitations period for filing petitions for death benefits could not be used to preserve untimely claims for medical expenses and pain and suffering damages, finding "overarching policy arguments are not availing." *Id.* The Federal Circuit explained that "[t]he Vaccine Program is more generous to petitioners than civil tort actions in some ways, *e.g.*, presumption of causation, less-adversarial proceedings, and relaxed rules of evidence," but cited the pain and suffering cap as an example of a limit that does not apply in civil tort suits, and noted other limiting features such as the single petition rule, the statute of limitations, and other compensation limits. *Id.* (citations omitted). Given such features as the fixed death benefit, 42 U.S.C. § 300aa-15(a)(2), the prohibition on punitive damages, *id.* § 300aa-15(d)(1), and, most importantly for this case, the cap on pain and suffering awards, *id.* § 300aa-15(a)(4), there is no warrant for interpreting individual provisions of the Vaccine Act under a gloss of generosity.

Ironically, the purposivism urged by petitioner poses the mirror image of the practice rejected in *Graves*, one of the primary authorities upon which Ms. Bossenbroek relies. *See* Pet'r's Mem. at 9–11. In that case, at issue was the approach of special masters to squeeze the entire continuum of pain and suffering to fit within the zero to $250,000 range allowed by the Vaccine Act, so that pain and suffering that was viewed to be some percentage of the most severe imaginable would only merit that percentage of the $250,000 cap, even though it might have corresponded to an award as much as fifty times that amount without regard to the cap. *See Graves*, 109 Fed. Cl. at 581, 583, 588–89, 595–96. This "artificial" limit on damages was found to be contrary to the proper construction of the cap provision. *See id.* at 588, 591. But petitioner would insert into the process an equally artificial concept, not a squeeze but a stretch---some sort of generosity premium above what a tort suit award might be for the pain and suffering endured. Such a calculation

would be impossible, of course, if Ms. Bossenbroek were correct that special masters are forbidden from even considering the size of state court verdicts.  *See* Tr. (September 15, 2020) (Tr.), ECF No. 108, at 16.  The matter is all the more confounding, given petitioner's somewhat counterintuitive suggestion that damage awards in state tort cases could be systemically on the low side, due to the zeal with which tortfeasors and their insurance companies will litigate.  *See* Pet'r's Mem. at 8.[10]  Fortunately, the text of the Vaccine Act contains no ambiguous "generosity" provision mandating such an indeterminate award inflator.

Petitioner's remaining argument against the consideration of damage awards made in state court proceedings is based on the notion that "the Federal Circuit has specifically rejected several attempts by parties in Program cases to inject State law principles to vaccine cases brought in the Vaccine Program."  *Id.* at 6.  The only decision of the Federal Circuit cited to support this proposition was *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1351 (Fed. Cir. 1999).[11]  In that case, the Circuit declined to base the determination of causation on the laws of the state where the injury occurred, because doing so would threaten the uniformity and ease of administration the Vaccine Act seeks to achieve.  *See id.*  Instead, the Federal Circuit adopted the approach taken in the Restatement (Second) of Torts.  *Id.* at 1351–53.  Since Restatements are, by their nature, based on a survey of various state judicial opinions,[12] it is hard to see how *Shyface* can be used to preclude a

---

[10]  The conventional wisdom, and some data, seem to be to the contrary.  *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 424 (1994) (explaining "[c]ommon-law courts in the United States followed their English predecessors in providing judicial review of the size of damages awards" because "juries sometimes awarded damages so high as to require correction"); Theodore Eisenberg & Michael Heise, *Judge-Jury Difference in Punitive Damages Awards: Who Listens to the Supreme Court?*, 8 J. EMPIRICAL LEGAL STUD. 325, 332 (2011) (noting data which "makes clear that, consistent with conventional wisdom, jury trials involved higher compensatory and punitive damage awards than judge trials"); Joni Hersch & W. Kip Viscusi, *Punitive Damages: How Judges and Juries Perform*, 33 J. LEGAL STUD. 1, 17–20 (2004) (finding compensatory damages awards higher in jury than in bench trials, when no punitive damages are involved).

[11]  Petitioner also cited one dissenting opinion.  *See* Pet'r's Mem. at 6 (citing *Zatuchni*, 516 F.3d at 1330 (Dyk, J., dissenting)).

[12]  *See, e.g.*, Shyamkrishna Balganesh, *Relying on Restatements*, 122 COLUM. L. REV. 2119, 2124 (2022) ("The black-letter text of Restatements is drawn directly from the language and content of actual judicial opinions, which it synthesizes into succinct directives.").  Concerns have been raised whether modern Restatements have strayed from the function of describing the current state of common law in America.

special master from consulting a survey of various state court verdicts. In any event, damages verdicts are not the substantive law of a state, but rather the factual determinations of juries concerning how particular amounts of pain and suffering should be valued. These verdicts may, of course, be influenced by peculiarities of state law such as differing approaches to contributory or comparative negligence or local caps on pain and suffering damages. But the Secretary had represented that none of the cases in the survey he presented involved "findings of comparative/contributory fault," Resp't's Br. on Damages at 6, and no pertinent state caps on damages have been identified.

Petitioner argues that verdicts in non-Vaccine Act cases involve different shoulder injuries than do SIRVA cases, which themselves vary greatly from petitioner to petitioner. *See* Pet'r's Br. at 13. But while these might be considerations in reviewing *how* a special master used non-Vaccine Act verdicts, they cannot justify a blanket ban on using such information. In the exercise of calculating the monetary value of a particular amount of pain suffered in one part of the body, the cause of the pain is of little relevance. This use of non-Vaccine Act damages cannot be distinguished from the consideration of non-Vaccine Act attorneys' fees awards in deciding the proper amount to be awarded under the Act, a practice which the Federal Circuit has affirmed. *See Masias v. Sec'y of Health & Hum. Servs.*, 634 F.3d 1283, 1292 (Fed. Cir. 2011). And it is the same practice followed in *Graves*, where our court conducted a "survey of other pain and suffering and emotional distress awards in other non-Vaccine Act cases" to determine that the decedent's compensation exceeded the cap. *Graves*, 109 Fed. Cl. at 595–96. For the reasons stated above, the Court concludes that the Vaccine Act does not prevent special masters from considering the damages awarded in non-Vaccine Act proceedings when making award decisions.

### *2. Did the Special Master Abuse His Discretion in His Consideration of Other Pain and Suffering Awards?*

Even in the absence of a statutory bar on the consideration of damages awards in other cases, there is still the possibility that the manner in which this consideration is undertaken---the methodology employed by a special master---could be an abuse of a special master's discretion. Petitioner argues that the Special Master improperly tried to craft an objective standard for determining pain and suffering damages, rather than relying on his own, personal, subjective judgment. Pet'r's Mem. at 14–15. As discussed above, the Vaccine Act does not contain any limitation on a special master's process of calculating pain and suffering damages. Nor can an attempt at objectivity be "clearly unreasonable, arbitrary, or fanciful." *Cottingham*, 971 F.3d at 1345.

---

*See Kansas v. Nebraska*, 574 U.S. 445, 475–76 (2015) (Scalia, concurring-in-part and dissenting-in-part).

While a requirement for objective evidence is not satisfied by mere subjective belief, *see, e.g.*, *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 560–61 (1961), there is no reason why a decision maker cannot base his subjective judgment upon objective factors.  Indeed, this is the basis for expert testimony, *see* Fed. R. Evid. 702(b); *General Electric Co. v. Joiner*, 522 U.S. 136, 144–45 (1997) (upholding exclusion of expert testimony which relied upon studies that "were so dissimilar to the facts presented in th[e] litigation"); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014) (explaining that expert testimony may be excluded when it rests on "legally insufficient facts and data"), and is what allows our court to evaluate subjective decisions such as procurement choices, *see USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 462 (2010) (review involves "verifying that objective elements contained in the agency's analysis . . . correspond to the evidence in the record").

Petitioner argues that a special master, in reaching his subjective judgment, may only rely on the facts of the case before him, and thus cannot consider awards by other special masters involving the circumstances of other petitioners.  Pet'r's Mem. at 15.  But the experiences of other people are frequently relied upon by petitioners to prove eligibility for compensation, as these are the bases for epidemiological studies.  *See Grant v. Sec'y of Dep't of Health & Hum. Servs.*, 956 F.2d 1144, 1148–49 (Fed. Cir. 1992); *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1366 (Fed. Cir. 2000) (noting "[a] study of many individual cases may be useful evidence as to causation").  While such studies cannot be required proof, they can be probative of causation.  *Andreu ex rel. Andreu v. Sec'y of Health & Hum. Srvs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009).  This type of evidence is not limited to aggregate data but can also include case studies of individuals.  *See Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1379 (Fed. Cir. 2015).  If a petitioner's entitlement to any award at all may be based, in part, on facts concerning other individuals, it is hard to see why the amount of damages awarded cannot similarly be based on such information.  Indeed, petitioner acknowledges, *see* Pet'r's Mem. at 15 n.8, that our court had previously found "nothing improper in [a] special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in [a] case."  *Doe*34*, 87 Fed. Cl. at 768.  Paradoxically, Ms. Bossenbroek maintains this finding was "highly dubious," because of the large degree of discretion and subjectivity involved in the determination of a pain and suffering award. Pet'r's Mem. at 15 n.8.

But what is unreasonable about a special master, in his discretion, consulting the subjective decisions of others, in reaching his own subjective judgment about the monetary value of pain and suffering in a particular case?  This is an area in which most people have little to no frame of reference, and might be as at sea as a non-physicist asked to estimate the weight of an elephant on the moon, or a person who is not a racing enthusiast trying to guess the length of a Formula One circuit---and

those queries have objective answers.  There is, however, no market-determined price for pain, suffering, and emotional distress, or even a catalogue containing the going rate from one source.  An expert, perhaps, can be called upon to put a dollar figure on the loss of enjoyment of life, and derive the measure of what is called hedonic damages.[13]  One early case in the vaccine program featured a hedonics expert, *see Wasson v. Sec'y of Dep't of Health & Hum. Servs.*, No. 90-208V, 1992 WL 26662, at *4–5 (Fed. Cl. Sp. Mstr. Jan. 2, 1992), *aff'd* 988 F.2d 131, 1993 WL 18492, at *2 (Fed. Cir. 1993) (per curiam), but the discipline does not seem to have caught on.

Alternatively, a trier of fact could engage in the artificial activities of considering how much he would pay to remove a particular amount of pain and suffering, or would demand to be paid to endure it.  *See Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001) (citation omitted).[14]  Although these might seem to be two sides of the same coin, academic literature has shown that the perspective matters, and that good health already enjoyed is dearer than the move from poor to better health.  *See* Edward J. McCaffery, Daniel J. Kahneman & Matthew L. Spitzer, *Framing the Jury: Cognitive Perspectives on Pain and Suffering Awards*, 81 VA. L. REV. 1341, 1351–54 (1995).[15]  But since, masochists notwithstanding, there is no discernible market for such bargains, a more practical approach might be for the fact-finder to ask how much one would pay to insure against the risk of pain infliction, or demand in order to assume a similar risk.[16]  While such an approach might be rooted in real-world circumstances, such as the

---

[13]  *See* Douglas L. Price, *Hedonic Damages:  To Value a Life or Not to Value a Life?*, 95 W. VA. L. REV. 1055, 1056 (1993).

[14]  Some jurisdictions have apparently not allowed plaintiffs' lawyers to suggest this approach to jurors.  *See* Ronen Avraham, *Putting a Price on Pain-and-Suffering Damages:  A Critique of the Current Approaches and a Preliminary Proposal for Change*, 100 NW. U. L. REV. 87, 90 (2006); Mark Geistfeld, *Placing a Price on Pain and Suffering: A Method for Helping Juries Determine Tort Damages for Nonmonetary Injuries*, 83 CALIF. L. REV. 773, 831 (1995).

[15]  Those familiar with economic theory will recognize this as the "endowment effect" or the difference between exchange and use value.  *See* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 19 (9th ed. 2014) (explaining the endowment effect); RICHARD A. EPSTEIN, SUPREME NEGLECT: HOW TO REVIVE CONSTITUTIONAL PROTECTION FOR PRIVATE PROPERTY 90–91 (2008) (discussing the consequences of basing just compensation on fair market "exchange value" rather than subjective "use value" of real property).

[16]  *See* Geistfeld, *supra* note 14, at 818–28.

premium demanded to perform dangerous work or to insure a dangerous product, it also relies on artificial factors such as an individual's determination of the likelihood of the injury and the size of the premium, and can be unrealistic.[17]

With these alternative forms of measurement being less than fully baked, the ready-made measures in existence that fit the subject are awards in other cases. As one of the more prominent jurists of the last half-century explained concerning pain and suffering awards, if they are to be treated "as a standardless, unguided exercise of discretion by the trier of fact," then "[t]o minimize the arbitrary variance in awards bound to result from such a throw-up-the-hands approach, the trier of fact should . . . be informed of the amounts of pain and suffering damages awarded in similar cases." *Jutzi-Johnson*, 263 F.3d at 759 (Posner, J.) (citations omitted). Writing for the Seventh Circuit, Judge Posner concluded "[i]t would be a wise practice" for a judicial trier of fact "to set forth in his opinion the damages awards that he considered comparable," mirroring how his court reviewed pain and suffering awards. *Id.* Thus, the consideration of damages awards in comparable cases comes well recommended.

There is, of course, the danger that the case (or cases) to which one is anchoring a damages determination is itself arbitrarily decided.[18] Studies of jury verdicts have shown a wide variance in damages awarded for cases of apparently similar severity.[19] Academic commentary supports the notion of averaging a suitably large set of comparable cases, to eliminate the variability problem.[20] But determining comparability could be a difficult task, one perhaps better left in the hands of experts rather than amateurs. Special masters should be particularly cautious in using unexplained jury verdicts instead of reasoned bench determinations to inform pain and suffering calculations. *See Rafferty v. Sec'y of Health & Hum. Servs.*, No. 17-1906V, 2020 WL 3495956, at *18 (Fed. Cl. Sp. Mstr.

---

[17] *See* Avraham, *supra* note 14, at 109.

[18] *See, e.g.*, Geistfeld, *supra* note 14, at 792 ("If the system has been providing overly arbitrary pain-and-suffering awards, and if we have no method for determining the appropriate award in the first instance, why should we make prior awards the cornerstone of future awards?").

[19] *See id.* at 784–85; *see also* Randall R. Bovberg, Frank A. Sloan & James F. Blumstein, *Valuing Life and Limb in Tort: Scheduling "Pain and Suffering,"* 83 Nw. U. L. Rev. 908, 923–24 (1989).

[20] *See* Hillel J. Bavli, *The Logic of Comparable-Case Guidance in the Determination of Awards for Pain and Suffering and Punitive Damages*, 85 U. Cin. L. Rev. 1, 18–31 (2017).

May 21, 2020) (finding "not helpful" verdict summaries with "no information regarding the severity and duration of these injuries").

Although Ms. Bossenbroek argues to the contrary, *see* Pet'r's Br. at 11, 13, here the special master did not rely on the unreasoned jury verdicts from tort cases to determine the amount of pain and suffering damages he awarded. The Court recognizes that it might well be an abuse of discretion were a special master to use the damages awarded in another case, or an average of damages awarded in other cases, to determine damages in the absence of a finding that the other cases are comparable in terms of the severity, duration, or impact of the pain and suffering being compensated. But here, the special master merely used the "useful information" of pain and suffering awards for non-Vaccine Act shoulder injuries for the purpose of verifying that SIRVA awards under the program were not less generous than those awards. *Bossenbroek*, 2020 WL 2510454, at *9. After reaching this conclusion, he made no further reference to the tort verdicts data. *See id.* at *10–12. Nor did he find that the lower tort damages constituted a reason to depart downward from past SIRVA awards, a conclusion which could be problematic in the absence of any findings of comparability. He used the tort verdict data for purposes of a reality check concerning the size of SIRVA awards generally, a methodology which the Court finds is not "clearly unreasonable, arbitrary, or fanciful." *Cottingham*, 971 F.3d at 1345.

After noting that the verdicts survey information did not show that awards under the Act were less generous than jury awards, the Special Master identified the *Knauss* case from the program as "roughly analogous" and summarized the main factors leading to a $60,000 award for pain and suffering in that case. *Bossenbroek*, 2020 WL 2510454, at *10 (citing *Knauss*, 2018 WL 3432906, at *8). While the Special Master explained, referring to the survey of verdicts and *Knauss*, that "[c]ollectively, these cases provide a framework for evaluating the individual circumstances of Ms. Bossenbroek's case," only the *Knauss* award is specifically identified in his analysis. *See id.* at *10–12. He thus followed the unremarkable approach of considering the damages awarded in the most analogous case from the program, *see, e.g.*, *Doe*34*, 87 Fed. Cl. at 768, which is not unreasonable as it reflects a uniform approach to awarding these damages, *see Shyface*, 165 F.3d at 1351. The Special Master can hardly be faulted for identifying the case he found most comparable to petitioner's. *See Jutzi-Johnson*, 263 F.3d at 759. In any event, the award determination is ultimately based on details from Ms. Bossenbroek's medical history and evidence of the impact of the injury on her activities, from which the Special Master concluded "the worst of her pain lasted two months," and apparently found less actual pain and suffering than the *Knauss* injury involved. *See Bossenbroek*, 2020 WL 2510454, at *10–11. Under the circumstances, the Special Master looked to relevant evidence, drew plausible inferences, and articulated a rational basis for the award, and thus did not act arbitrarily and capriciously. *Sevier*, 940 F.2d at 1528.

### *3. Was Emotional Distress Evidence Considered?*

Petitioner somewhat cursorily argues that the Special Master erred by not considering her evidence of emotional distress. *See* Pet'r's Mem. at 19–20. She maintains that his decision was based "strictly on petitioner's level of physical pain and suffering, relying upon the infrequency of her medical visits to conclude petitioner suffered a low level of physical pain." *Id.* at 19. Petitioner identifies evidence of emotional distress that she contends was never discussed by the Special Master, including lack of sleep, feeling like she was not a good mother, interference with daily activities, time lost to appointments, and uncomfortable rehabilitation routines. *See* App. to *id.* ¶ 18, ECF No. 100-1 at 4; *id.* at 20 & n.15.

Petitioner, however, concedes that she did not request any specific amount of damages for emotional distress as such. *See* Tr. at 42. Her briefing before the Special Master did not categorize any evidence as pertaining to "emotional distress," a phrase that does not even appear in her reply paper, *see* Pet'r's Reply Mem. on Damages at 1–17, and is used in her initial damages brief only in reference to cases cited, not to evidence, *see* Pet'r's Mem. on Damages at 8, 15. The Court notes that the Special Master did discuss much of what Ms. Bossenbroek now characterizes as emotional distress evidence in detailing the course of petitioner's injury, including trouble sleeping; interference with breastfeeding, and with moving to a new home; the need to do yoga and stretches; and having to do "everything with pain." *Bossenbroek*, 2020 WL 2510454, at *4–7. He also recounted that "the winter of 2015-16 was a very trying time for" petitioner. *Id.* at *5. And in his analysis, the Special Master highlighted petitioner's difficulty with breastfeeding and noted her need to do stretches and yoga, her need for assistance carrying luggage and other heavy objects, and the testimony of her witnesses about her continuing pain, while concluding that the "inconveniences were relatively minor." *Id.* at *10–11. These references demonstrate that this type of evidence was not ignored.

The Special Master, to be sure, focused his analysis on relatively objective measures of suffering, such as interference with Ms. Bossenbroek's daily activities, visits to medical professionals, and the pain rating provided to those medical professionals as part of the treatment process. *See id.* This was not arbitrary or erroneous. There was no objective evidence of appreciable emotional distress of which the Special Master failed to take account, such as visits to a mental health professional or medical records documenting emotional suffering. Instead, petitioner points to certain passing references in the testimony of petitioner, or affidavits executed by her, that mention her unhappiness with this situation. *See* App. to Pet'r's Mem. ¶ 18 (citing, *inter alia,* Exs. 7, 11, and 18, and Sp. Mstr. Tr. at 29). But even in the small snapshot of all the evidence to which the petitioner directs the Court, the bulk of that testimony concerned physical pain, rather than the resulting emotional distress. *See* Sp. Mstr. Tr. at 17, 19–20, 25, 28–29, 49, 66. Under these circumstances, in which a case for a separate emotional distress

component of damages was not attempted by petitioner, the Special Master provided a detailed recitation of Ms. Bossenbroek's medical history, and the Special Master reasonably articulated the basis for his conclusion regarding the amount of damages to be awarded, the Court can find nothing improper in the Special Master's consideration of evidence relating to emotional distress.

### 4.  Should Inflation Have Factored into the Award Calculation?

Petitioner contends the Special Master erred by failing to discuss the effects of inflation when calculating the award for pain and suffering.  *See* Pet'r's Mem. at 18–19; Tr. at 57–64, 109.  She notes that the price level has more than doubled since the vaccine program became effective in 1988, Pet'r's Mem. at 18---a point she raised before the Special Master, Pet'r's Reply Mem. on Damages at 8–9---and that some SIRVA awards were a decade old by the time her award was calculated, Tr. at 57, 60.  And Ms. Bossenbroek again references the "generosity" animating the program, arguing that Congress intended for the caps on pain and suffering awards to be increased for inflation to keep awards "meaningful" rather than "token amounts."  Pet'r's Mem. at 18–19 n.13 (quoting H.R. REP. NO. 99-908, pt. 1, at 24).  But purposivism is even less availing for this topic, as the legislative history cited concerned an inflation-indexing provision that was repealed by Congress at the time the program was placed under our jurisdiction. *See* Pub. L. No. 100-203, § 4303(d)(2)(B) (repealing initial 42 U.S.C. § 300aa–18), § 4307 (assigning jurisdiction to our court).

And while Ms. Bossenbroek is correct regarding the amount of inflation suffered by our nation since 1988, this phenomenon has no bearing on the Special Master's award of damages for past pain and suffering, which was not expressed in 1988 dollars or based on 1988 awards.  *See Bossenbroek*, 2020 WL 2510454, at *10–11.  Nor did the decade's worth of inflation that accumulated since the advent of SIRVA claims have any relevance to his decision.  The one comparable case the Special Master identified, which he found "roughly analogous" and presumably involving greater suffering than Ms. Bossenbroek's, was from just two years earlier. *See id.* at *10 (citing *Knauss*, 2018 WL 3432906, at *8).  With the low inflation environment at that time, the roughly 2% in inflation need not have been discussed for the calculation---which in any event did not strictly correspond to the *Knauss* award---to be non-arbitrary.  The Court recognizes, however, that it may well be arbitrary for a special master to directly tie a damages calculation to an award in a comparable case made several years in the past, without adjusting the prior award for inflation.  This, however, is not that case.

### 5.  The Calculation of Future Pain and Suffering Damages

Regarding the final matter, the award for future pain and suffering, the Special Master seems to have erred in two respects.  The first error, which was

harmless, was to incorrectly recite the per year amount of future pain and suffering damages sought by petitioner.  She requested $2,500 per year, *see* Pet'r's Mem. on Damages at 7, but the Special Master stated Ms. Bossenbroek asked for only $1,200, *Bossenbroek*, 2020 WL 2510454, at *11.  As the Special Master accepted the respondent's figure as appropriate, this error was not prejudicial.  *See supra* note 3.  The Special Master did, however, fail to make a clear finding with respect to Ms. Bossenbroek's life expectancy when calculating this portion of the award.  After noting that petitioner used "a life expectancy calculator from the Social Security Administration" to project another 52.2 years of life at that time, and explaining that the Secretary's proposal showed 48 additional years without any supporting evidence, the Special Master fails to expressly choose either figure.  *See id.* at *11–12.  Given the 1% net discount rate, which is unchallenged, the resulting award seems to correspond to the 48-year projection.  As the Special Master acknowledged this figure was advanced "[w]ithout citing any evidence for life expectancy," *id.* at *11, a rational basis for this portion of the award has not been articulated, *see Sevier*, 940 F.2d at 1528.  Because the Court cannot determine the basis for the award of $11,692.19 for future pain and suffering, this matter must be remanded to the Special Master for an express determination of the life expectancy figure used to calculate future pain and suffering.  In addition, the Special Master shall adjust the award for past pain and suffering to reflect the time that has passed since the award decision was issued.  *See McAllister*, 70 F.3d at 1243 (explaining that, on remand, "the calculation of the award, including the allocation of compensation for past and future pain and suffering, should be updated at that time").

### III. CONCLUSION

For the reasons stated above, petitioner's motion for review is **GRANTED-IN-PART** and **DENIED-IN-PART**.  This matter is **REMANDED** to the Special Master for an express determination of petitioner's life expectancy for purposes of calculating future pain and suffering damages, and an updating of past pain and suffering damages reflecting the delay in entry of judgment due to the review proceedings.  Pursuant to 42 U.S.C. § 300aa-12(e)(2), the Special Master shall complete proceedings on remand within 90 days.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Senior Judge